Aaron Amartei **COMMEY, Petitioner,**

v.

Jeff **GRONDOLSKY, Respondent.**

Civil Action No. 13–13079–RBC.[1]

United States District Court,
D. Massachusetts.

March 7, 2014.

---

1. With the parties' consent, this case has been assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (# 16)

Jennifer A. Serafyn, United States Attorney's Office MA, Boston, MA, for Respondent.

### MEMORANDUM AND ORDER TRANSFERRING CASE TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. § 1406(a)

COLLINGS, United States Magistrate Judge.

Petitioner Aaron Amartei Commey ("Commey") has filed a Petition for a Writ of Habeas Corpus (# 1) in the United States District Court for the District of Massachusetts. The respondent is Jeff Grondolsky who is Warden of the Federal Medical Center, Devens, Massachusetts ("FMC–Devens"). The petition was filed at a time when Commey was incarcerated at FMC–Devens. He has subsequently been transferred to the Federal Medical Center, Springfield, Missouri and has, to date, remained in custody at that institution.

The reason for Commey's incarceration is that in a criminal case in filed in the Eastern District of New York, Commey was found not guilty by reason of insanity and was committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4243(e). In that Court, it is averred that he has filed a motion for a release hearing in the criminal case, but it has not yet been acted upon. *See* Petition, # 1 at ¶ 6, Government's Opposition, # 15 at p. 2.

Commey's claim in the instant petition is simple and straightforward, i.e., that his ... incarceration, detention and restraint is [sic] unlawful because the petitioner is not now mentally ill and has not suffered from a mental illness for over 7 years. Petitioner has not evidenced any danger to others the entire time he has been held at FMC Devens. Furthermore, petitioner is being illegally confined in a federal prison in violation of the United States Constitution and federal statutes.

Petition, # 1 at ¶ 4.

He seeks a "hearing" and that he "... be ordered discharged from the detention and restraint described in this application." Petition, # 1 at p. 2. Petitioner makes the same points in a Motion for Preliminary Injunction (# 17) in which he seeks release pending final adjudication of the Petition.[2]

The disposition of this case in the District of Massachusetts is governed by the case of *Archuleta v. Hedrick*, 365 F.3d 644 (8th Cir.2004). When a person is committed pursuant to 18 U.S.C. § 4243 and challenges his continued confinement under that statute, he "... may, at any time during [the] confinement, file **with the court that ordered the commitment** a motion for a hearing to determine whether the person should be discharged ..." 18 U.S.C. § 4247(h) (Emphasis added). *See Archuleta*, 365 F.3d at 649. Thus, only the United States District Court for the Eastern District of New York "... may grant the statutory relief [Commey] seeks, either conditional or unconditional release." *Id.* (citing 18 U.S.C. § 4247 and *United States v. Budell*, 187 F.3d 1137 (9th Cir.1999)).

---

**2.** In 2009, Commey brought an action against several individuals at FMC–Devens alleging wrongful conduct in connect with Risk Assessment Reports which had been written about his suitability for release. The case was dismissed. *See Commey v. Channell*, 2012 WL 3245974 (D.Mass. Aug. 6, 2012).

Further, the District Court in the Eastern District of New York "... has discretion to take jurisdiction over [Commey's] pro se habeas petition under either 18 U.S.C. § 4247(g), or 18 U.S.C. § 4247(h), or both ... [and] in these circumstances, a transfer of the petition under 28 U.S.C. § 1406(a) is both permissible and appropriate." *Archuleta,* 365 F.3d at 649.

For all the reasons stated, it is ORDERED that the above-styled cause be, and the same hereby is, TRANSFERRED to the United States District Court for the Eastern District of New York at Brooklyn pursuant to 28 U.S.C. § 1406(a). Courtroom Deputy Clerk Noreen A. Russo, Esquire, is directed to effectuate the transfer.

**Nina SHERVIN, M.D., Plaintiff,**

**v.**

**PARTNERS HEALTHCARE SYSTEM, INC. et al., Defendants.**

**Civil Action No. 10–cv–10601.**

United States District Court, D. Massachusetts.

Signed March 7, 2014.

Lynn C. Norton, Ellen J. Zucker, Emily J. Nelson, Laura R. Studen, Michael V. Samarel, Burns & Levinson LLP, Boston, MA, for Plaintiff.

Herbert L. Holtz, Amie Tracia Geary, Eugene J. Sullivan, III, Patrick H. Foley, Holtz & Reed, LLP, Rebecca J. Wilson, Sherry Y. Mulloy, Peabody & Arnold, LLP, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

CASPER, District Judge.

## I. Introduction

Plaintiff Nina Shervin, M.D. ("Dr. Shervin") has brought suit against the several Defendants based on alleged gender discrimination. D. 38. Dr. Shervin's complaint alleges: gender discrimination in violation of Mass. Gen. L. c. 151B ("c.151B") against Defendants Partners Healthcare System, Inc. ("Partners"), Massachusetts General Physicians Organization ("MGPO"), the President and Fellows of Harvard College/Harvard Medical School ("Harvard"), Harry Rubash, M.D. ("Dr. Rubash") and James Herndon, M.D. ("Dr. Herndon") (Counts 1–5); gender discrimination in violation of c. 151C against Partners and Harvard (Counts 6–7); gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, against Partners, MGPO and Harvard (Counts 8–10); retaliation in violation of c. 151B against Partners, MGPO, Harvard, Dr. Rubash and Dr. Herndon (Counts 11–15); retaliation in violation of Title VII against Partners, MGPO and Harvard (Counts 16–18); and tortious interference with advantageous and/or contractual relations against Partners, Dr. Rubash and Dr. Herndon (Counts 19–21).[1] D. 38. The Defendants have moved for summary judgment on a number of grounds. D. 144, D. 145, D. 148, D. 149. For the reasons discussed below, the Court DENIES IN PART and ALLOWS IN PART Dr. Rubash's motion, D. 144; DENIES IN PART and ALLOWS IN PART Dr. Herndon's motion, D. 145; DENIES IN PART and ALLOWS IN PART Harvard's motion, D. 148; and DENIES IN PART and AL-LOWS IN PART Partners' motion, D. 149.[2] The upshot of these rulings is that the timely claims of discrimination and retaliation brought by Dr. Shervin as well as the interference claims will go forward to trial.

## II. Facts

As discussed in the Court's legal analysis, a number of the material facts in this case remain disputed. To the extent a material fact is undisputed, the Court refers to either Harvard's Statement of Material Facts, D. 153, or the remaining Defendants' Amended Joint Statement of Material Facts, D. 172, and Dr. Shervin's responses to same, D. 230 and D. 229, respectively. To the extent Dr. Shervin raises additional allegations, the Court refers only to her additional Statement of Material Facts, D. 217, or her responses to the Defendants' Statements of Material Facts, again D. 229 and D. 230.

### A. *Background*

Dr. Shervin, an orthopaedic surgeon, was a medical resident in the Harvard Combined Orthopedic Residency Program ("HCORP"), a five-year, post-graduate medical residency program. D. 172 ¶¶ 1, 6; D. 229 ¶¶ 1, 6. HCORP residents are taught at four Boston hospitals: Massachusetts General Hospital ("MGH"), Brigham and Women's Hospital ("Brigham"), the Children's Hospital of Boston and the Beth Israel Deaconess Medical Center ("Beth Israel"). D. 172 ¶ 6; D. 229 ¶ 6. Each HCORP class has twelve residents. D. 172 ¶ 9; D. 229 ¶ 9.

The HCORP Executive Committee ("the Executive Committee") is HCORP's gov-

---

1. The Court has since dismissed Count 7. D. 40 at 2. Partners has also represented to the Court that Dr. Shervin has agreed to dismiss Count 6. D. 149 at 1.

2. Partners and MGPO filed a joint motion for summary judgment. *See* D. 149.

erning body. D. 172 ¶ 11; D. 229 ¶ 11. It is comprised of the chiefs of each HCORP hospital's department of orthopaedic surgery as well as the HCORP Program Director. *Id.*

Partners, a non-profit, charitable organization, is an integrated healthcare system that includes several hospitals, including MGH and Brigham, a physician network and other health-related entities. D. 172 ¶ 2; D. 229 ¶ 2. MGPO is a private corporation and it is undisputed that MGPO employs at least some MGH physicians. D. 172 ¶ 3; D. 229 ¶ 3.

Dr. Herndon is a Professor of Orthopaedic Surgery at Harvard Medical School ("HMS") and served as the HCORP Program Director from 1998 to 2008. D. 172 ¶ 4; D. 229 ¶ 4. The Program Director has at least some oversight over HCORP and the Program Director's responsibilities include overseeing and organizing residents' educational programs, including resident evaluations. D. 172 ¶ 10; D. 229 ¶ 10.

Dr. Rubash remains the Chief of the Department of Orthopaedic Surgery at MGH and a Professor of Orthopaedic Surgery at HMS. D. 172 ¶ 5; D. 229 ¶ 5. He also served on the Executive Committee. D. 172 ¶ 12; D. 229 ¶ 12.

### B. *Dr. Shervin's HCORP Residency and Probation*

#### 1. *Dr. Herndon Imposes Probation on Dr. Shervin*

Dr. Shervin entered her HCORP residency in 2003. D. 172 ¶ 14; D. 229 ¶ 14. Dr. Shervin contends that she performed well at the beginning of her residency.[3] D. 217 ¶¶ 91–100, 132–138. However, on January 30, 2007, while Dr. Shervin was in her fourth year of residency, Dr. Herndon met with Dr. Hari Parvataneni ("Dr. Parvata-

neni"), an arthroplasty fellow at MGH. D. 172 ¶ 16; D. 229 ¶ 16; Deposition of Dr. Herndon (D. 157–4 at 19). The parties do not dispute that during that meeting, Dr. Parvataneni made complaints to Dr. Herndon about Dr. Shervin. *Id.*

On February 2, 2007, Dr. Herndon and Dr. Shervin met. D. 172 ¶ 18; D. 229 ¶ 18; D. 157–4 at 21. At this meeting, Dr. Herndon informed Dr. Shervin that he was placing her on probation. *Id.* Dr. Shervin asserts that during the meeting, Dr. Herndon threatened her ability to complete HCORP and her post-graduate fellowship. D. 172 ¶ 19; D. 229 ¶ 19; Deposition of Dr. Shervin (D. 157–1 at 63). She further asserts that Dr. Herndon told her during the meeting that the effects of probation could affect her medical license, board certification, fellowship and employment opportunities. *Id.* Dr. Shervin also contends that Dr. Herndon did not allow her the opportunity during the meeting to address the allegations he raised. D. 172 ¶ 21; D. 229 ¶ 21.

In a letter dated March 7, 2007, Dr. Herndon provided Dr. Shervin with written notice of her three-month probation. D. 172 ¶ 22; D. 229 ¶ 22; Letter from Dr. Herndon (D. 157–11). Dr. Herndon's letter cited as reasons for the probation her clinical performance, low exams scores, tardiness and negative feedback from other residents and fellows. *Id.*

In March 2007, Dr. Shervin met with Dr. Rubash to express her concerns that Dr. Herndon's decision to place her on probation was fueled by gender discrimination. D. 172 ¶ 27; D. 229 ¶ 27; D. 157–1 at 65. Around the same time, Dr. Dennis Burke ("Dr. Burke"), an MGH orthopaedic surgeon who worked with Dr. Shervin, D. 172 ¶ 13; D. 229 ¶ 13; Deposition of Dr.

---

**3.** Dr. Shervin has presented an affidavit from Dr. Burke stating that he was very impressed with Dr. Shervin, whom he described as a "rising star." D. 221–8 at 2.

Burke (D. 157–9 at 41), also expressed to Dr. Rubash that Dr. Shervin felt that she was placed on probation because of gender bias. D. 172 ¶ 30; D. 229 ¶ 30; Deposition of Dr. Rubash (D. 157–5 at 34). Dr. Shervin alleges that during the meeting with Dr. Rubash, he discouraged her from taking any legal action and questioned her regarding her desire to graduate. D. 172 ¶ 40; D. 229 ¶ 40; D. 157–1 at 65.

### 2. Dr. Shervin Requests Review of Probation Decision

Each year of her residency, Dr. Shervin entered into a residency contract, titled "Graduate Trainee Benefits and Responsibilities." D. 153 ¶ 53; D. 230 ¶ 53; Deposition of Dr. Shervin (D. 153–20 at 8). Each residency contract provides that a copy of the "Graduate Trainee Adverse Action Process" and "Graduate Trainee Redress of Grievance" policies was to be attached to the residency contract. D. 153 ¶ 63; D. 230 ¶ 63; Dr. Shervin's Residency Contracts (D. 153–23; D. 153–24; D. 153–25). On March 27, 2007, Dr. Shervin wrote to Dr. James Kasser ("Dr. Kasser"), the Executive Committee Chairman, seeking an Executive Committee review of her probation and citing the Partners Graduate Trainee Adverse Action Process as evidence that the proper procedures were not followed in placing her on probation. D. 172 ¶ 36; D. 229 ¶ 36; D. 153 ¶ 94; D. 230 ¶ 94; March 27, 2007 Letter to Dr. Kasser (D. 157–15). She also requested that the probation be expunged from her records. D. 172 ¶ 36; D. 229 ¶ 36; D. 157–15. On April 6, 2007, Dr. Burke wrote to Dr. Kasser requesting that Dr. Shervin be afforded a fair hearing. D. 172 ¶ 37; D. 229 ¶ 37; April 6, 2007 Letter from Dr. Burke to Dr. Kasser (D. 157–16).

The parties do not dispute that once the Executive Committee's investigation into Dr. Shervin's probation began, Dr. Rubash discussed Dr. Shervin with other residents and fellows. D. 172 ¶ 42; D. 229 ¶ 42; Dr. Rubash's Answers to Interrogatories (D. 157–17 at 5–6). Dr. Michael Fehm ("Dr. Fehm") has stated that he had one such discussion with Dr. Rubash. D. 172 ¶ 43; D. 229 ¶ 43; Deposition of Dr. Fehm (D. 157–18 at 9). Dr. Fehm stated that although Dr. Rubash expressed concern for Dr. Shervin, he also felt that toward the end of the discussion, Dr. Rubash attempted to elicit negative comments about Dr. Shervin. *Id.* Dr. Fehm said that he "saw this conversation as an effort to build armor against [Dr. Shervin]." *Id.*

On April 10, 2007, Dr. Herndon met with the Executive Committee regarding Dr. Shervin's probation. D. 172 ¶¶ 46–47; D. 229 ¶¶ 46–47; 157–4 at 27. Dr. Shervin also met with the Executive Committee in April 2007 and expressed her belief that she was being targeted and subjected to an atmosphere of retaliation. D. 172 ¶ 49; D. 229 ¶ 49; 157–1 at 67–68. Dr. Shervin asserts that in the spring and early summer of 2007, residents were being asked to find fault with her and that unfounded allegations were being raised against her. D. 172 ¶ 51; D. 229 ¶ 51; see D. 157–2 at 90–91.

Shortly after the Executive Committee meeting and, in April 2007, Dr. Shervin met with Dr. Ellice Lieberman ("Dr. Lieberman"), HMS's Dean for Faculty Affairs at the time, expressing her concerns about retaliation. D. 172 ¶ 50; D. 229 ¶ 50; D. 157–2 at 66–67. Dr. Shervin expressed to Dr. Lieberman that she felt she was being treated differently because she did not behave in ways in which women are stereotypically expected to behave and that she felt she was being punished for raising such concerns. *Id.*

On June 6, 2007, Dr. Kasser sent Dr. Shervin a letter informing her that the Executive Committee had decided that she would remain on probation. D. 172 ¶ 53;

D. 229 ¶ 53; Letter from Dr. Kasser (D. 157–19). Shortly thereafter, on June 19, 2007, Dr. Herndon informed Dr. Shervin that her probation would be extended for three months. D. 172 ¶ 56; D. 229 ¶ 56; see D. 157–4 at 29–30. On June 29, 2007, Dr. Herndon sent Dr. Shervin a letter providing written notice of her probation extension. D. 172 ¶ 58; D. 229 ¶ 58; Letter from Dr. Herndon (D. 157–21). In the letter, Dr. Herndon notified Dr. Shervin that he and Dr. Jo Shapiro ("Dr. Shapiro"), the Associate Director for Graduate Medical Education for Partners at the time, would meet with Dr. Shervin in September when Dr. Herndon returned from medical leave. D. 172 ¶¶ 56, 58; D. 229 ¶¶ 56, 58; D. 157–21.

On June 29, 2007, Dr. Burke wrote a letter to Dr. Nancy Tarbell ("Dr. Tarbell"), Director of the Office for Women's Careers at MGH, stating that he thought Dr. Shervin was being treated unfairly. D. 172 ¶ 60; D. 229 ¶ 60; Letter from Dr. Burke to Dr. Tarbell (D. 157–22). Dr. Shervin met with Dr. Tarbell on July 2, 2007 and also wrote Dr. Tarbell a letter expressing that she believed that Dr. Herndon was retaliating against her for questioning his probation decision. D. 172 ¶ 61; D. 229 ¶ 61; Letter from Dr. Shervin to Dr. Tarbell (D. 157–23).

### 3. Dr. Shervin's Probation Ends

During Dr. Herndon's medical leave during the summer of 2007, D. 172 ¶ 62; D. 229 ¶ 62; D. 157–4 at 16, Dr. Kasser was assigned to oversee Dr. Shervin's residency. D. 172 ¶ 58; D. 229 ¶ 58; D. 157–21. While on medical leave, Dr. Herndon received emails from two doctors reporting incidents concerning Dr. Shervin, one such incident being that Dr. Shervin was absent from an anatomy lecture. D. 172 ¶¶ 63, 65; D. 229 ¶¶ 63, 65; email from Dr. Scott to Dr. Herndon (D. 157–28). In late August 2007, Dr. Shervin wrote to Drs. Tarbell and Kasser stating that she felt Dr. Herndon was harassing and targeting her by trying to find fault with her performance. D. 172 ¶¶ 67–68; D. 229 ¶¶ 67–68; August 27, 2007 Email from Dr. Shervin (D. 157–29).

During a meeting on September 6, 2007, the Executive Committee decided to end Dr. Shervin's probation. D. 172 ¶ 71; D. 229 ¶ 71; Executive Committee Meeting Minutes (D. 157–31 at 3). As of the end of Dr. Shervin's probation, and consistent with Dr. Shervin's request, Dr. Herndon was no longer Dr. Shervin's residency director and was replaced by Dr. Kasser. D. 172 ¶¶ 74–75; D. 229 ¶¶ 74–75; D. 157–4 at 9–10.

### 4. Conclusion of Residency and Applying for a Medical Board License

In or around March to April 2008, Dr. Shervin sought information from at least Drs. Weinstein and Shapiro of the Partners Graduate Medical Education Office ("GME") regarding the effect of her earlier probation on her application for a medical license. D. 153 ¶ 112; D. 230 ¶ 112; April 7, 2008 email to Dr. Shervin (D. 153–40). According to Dr. Shervin, Drs. Weinstein and Shapiro of the GME told Dr. Shervin that probation was not an adverse action that needed to be reported to the Board of Registration in Medicine. D. 217 ¶ 327; April 7, 2008 email from Drs. Weinstein and Shapiro (D. 153–40 at 2); Deposition of Dr. Shapiro (D. 223–1). Dr. Shervin contends that she submitted her application for a license on April 11, 2008, reporting that she had never received a disciplinary action. D. 217 ¶ 333; Supplement Form to Board (D. 226–4). On June 13, 2008, Dr. Shervin asserts, the Board informed Dr. Shervin that her prior probation was considered disciplinary action, *id.* ¶ 337; Notice from Board (D. 226–7), and as a result, Dr. Shervin had to resubmit

her application, causing a delay in her obtaining her medical license; as result of probation, Dr. Shervin was issued was a "limited license" that would require her to be monitored and/or supervised during her fellowship, unlike other fellows. *Id.* ¶¶ 339–340, 344; Letter from Board (D. 226–16).

On June 20, 2008, residents, including Dr. Shervin, presented their theses. D. 172 ¶ 88; D. 229 ¶ 88; Deposition of Dr. Sanaz Hariri (D. 157–37 at 9–10). Some residents walked out of the room during or prior to Dr. Shervin's thesis presentation.[4] D. 172 ¶ 89; D. 229 ¶ 89; D. 157–37 at 9–10. Dr. Shervin contends that Dr. Herndon and other members of the Executive Committee were aware this would occur and took no action to prevent it from happening. D. 172 ¶¶ 351, 354–358; D. 229 ¶¶ 351, 354–358.

Dr. Shervin graduated from HCORP on June 30, 2008. D. 172 ¶ 96; D. 229 ¶ 96.

### C. *Dr. Shervin's Post–Residency Fellowship and Commencement of Grievance and Legal Proceedings*

Starting around August or September 2008, Dr. Shervin worked as a one-year fellow at MGH. D. 172 ¶¶ 1, 98; D. 229 ¶¶ 1, 98; D. 157–1 at 46–47; Engagement Letter (D. 157–42). Around August 8, 2008, Dr. Shervin, through counsel, informed Partners that she planned to proceed with a grievance before the Partners Graduate Education Committee ("Partners Education Committee"). D. 172 ¶ 99; D. 229 ¶ 99; August 7, 2008 email from Paul Cirel to Joan Stoddard (D. 157–43).

On March 25, 2009, Dr. Shervin submitted a grievance statement through counsel, in which she alleged that Dr. Herndon's

February 2007 probation decision "lacked any reasonable foundation in fact and was wholly deficient procedurally." D. 172 ¶ 102; D. 229 ¶ 102; Grievance Statement (D. 157–46 at 2). In the statement, she again raised her concern that Dr. Herndon had engaged in gender bias. D. 157–46 at 7. The statement also alleged that the Executive Committee extended her probation on "pretextual grounds." *Id.* at 3. The statement requested that "the decisions regarding probation be reversed and records relating to those decisions be expunged." *Id.* A Partners Education Committee Grievance Subcommittee ("the Grievance Subcommittee") was assembled to investigate and make a recommendation to the Partners Education Committee. D. 172 ¶ 103; D. 229 ¶ 103, 111; D. 153 ¶ 125; D. 230 ¶ 125; Deposition of Dr. Jonathan Borus (D. 157–47).

On April 1, 2009, Partners and Dr. Shervin engaged a mediator to "attempt to resolve the disputes between them." D. 172 ¶ 108; D. 229 ¶ 108; Letter from Mediator to MCAD (D. 157–54). The same day, Dr. Shervin and Partners entered into a Tolling Agreement ("the Tolling Agreement") providing that were Dr. Shervin to file a complaint with the Massachusetts Commission Against Discrimination ("MCAD") by a certain agreed-upon date, her MCAD complaint would be treated as having been filed on April 1, 2009 for statute of limitations purposes. D. 172 ¶ 109; D. 229 ¶ 109; Letter from Joan Stoddard to Ellen Zucker (D. 157–55).

Dr. Shervin completed her fellowship in the summer of 2009. D. 172 ¶ 110; D. 229 ¶ 110 D. 157–1 at 46–47. On October 14, 2009, the Grievance Subcommittee recom-

---

4. It is not entirely clear from the record who, if anyone, organized the "walkout." There is at least some suggestion that this action may have been a response to Dr. Shervin's lack of courtesy to fellow residents during their respective thesis presentations. D. 172 ¶ 89; Deposition of Dr. Coleen Sabatini, D. 157–38 at 7.

mended that the Partners Education Committee affirm the initial probation decision by Dr. Herndon, the ratification of same by the Executive Committee and the extension of the initial probation for three months, Grievance Subcommittee Report (D. 157–48 at 4–11); the parties do not dispute that the Partners Education Committee adopted the subcommittee's recommendation. D. 172 ¶ D. 229 ¶ 111.

On October 26, 2009, Dr. Shervin filed a discrimination complaint with MCAD and the U.S. Equal Employment Opportunity Commission ("EEOC") against Partners, Harvard, Dr. Herndon and Dr. Rubash. D. 172 ¶ 113; D. 229 ¶ 113; MCAD Complaint (D. 157–56). Dr. Shervin filed her complaint in this Court on April 9, 2010. D. 1.

### D. *Post–Fellowship Employment (2009–2010)*

The parties do not dispute that in 2005, while Dr. Shervin was in the third year of her residency, she had discussions with Drs. Burke, Rubash and others concerning the possibility of a post-fellowship staff position at MGH, which would include privileges at Newton–Wellesley Hospital ("Newton–Wellesley"). D. 172 ¶¶ 119–120, 124; D. 229 ¶¶ 119–120, 124; D. 157–1 at 4; D. 157–5 at 12. Upon Dr. Burke's suggestion, Dr. Shervin met with Dr. Rubash on November 30, 2005. D. 157–12; *see also* D. 172 ¶¶ 132–133; D. 229 ¶¶ 132–133. The parties do not dispute that Dr. Rubash recommended that Dr. Shervin meet with Dr. Andrew Freiberg ("Dr. Freiberg"), MGH's Chief of Arthroplasty service, to discuss fellowships. D. 172 ¶ 136; D. 229 ¶ 136; D. 157–1 at 14–15. Dr. Rubash also explained in the meeting the differences between academia and private practice. D. 172 ¶ 138; D. 229 ¶ 138; D. 157–5 at 13–14. Following the meeting, Dr. Rubash sent Dr. Burke an email stat-

ing that he was "very optimistic that we can do something for [Dr. Shervin] here." D. 172 ¶ 150; D. 229 ¶ 150; November 30, 2005 email from Rubash to Dr. Burke (D. 157–64).

In December 2005, Dr. Shervin met with Dr. Freiberg and, according to Dr. Shervin, they discussed his recommendations for fellowships and "coming on staff" at MGH and Newton–Wellesley. D. 172 ¶ 155; D. 229 ¶ 155; D. 157–1 at 12–13. Although the parties do not dispute that there were conversations in and around 2005 about the possibility of a post-fellowship staff position at MGH for Dr. Shervin, the Defendants deny that any agreement or employment offer regarding the same was made. *See* D. 229 ¶¶ 143–147. Dr. Shervin contends that the Defendants later interfered with her purported hiring at Newton–Wellesley and MGH in the spring of 2009. Dr. Shervin relies upon the fact that Dr. Rubash told a recommender that no staff positions were available, June 14, 2009 email from Dr. Rubash to Dr. Sunder (D. 227–14 at 2), which she contends was pretext for a retaliatory withdrawal of her contemplated employment offer. D. 229 ¶ 152.

### E. *Post–Complaint Employment Prospects*

Dr. Shervin also contends that retaliation for her earlier complaints of gender discrimination continued after she initiated this lawsuit. According to Dr. Shervin, she received an offer letter in or around the Spring 2012 from Cooley Dickinson Hospital ("Cooley"); see Draft Recruitment Letter (D. 228–2); D. 157–2 at 39. Affidavit of Dr. Henry Drinker (D. 227–24 at 3). At the time, Cooley was in negotiations with MGH about an affiliation. There is evidence in the affidavit of Dr. Henry Drinker, Director of Joints Replacement Services at Cooley who recruit-

ed Dr. Shervin, that after the hospital had tendered her a contract and after contact between Cooley management and MGH management, the offer was withdrawn in or around late 2012. *Id.* at 3–4.

Dr. Shervin also alleges that around June 2012, Dr. Mark Gebhardt, chief of the orthopaedic service at Beth Israel Deaconess Medical Center–Milton Hospital ("Milton"), not a party to this lawsuit, contributed to her being deprived of the opportunity to join the Beth–Israel Deaconess Physicians Organization. D. 172 ¶ 183–185; D. 229 ¶ 183–185; D. 153 ¶ 142; D. 230 ¶ 142; Deposition of Dr. Joseph Morrissey (D. 228–6 at 11–12); D. 157–2 at 25–34, 44–45.

### III. Procedural History

Dr. Shervin initiated this action on April 9, 2010. D. 1. Dr. Shervin filed an amended complaint on July 13, 2010, in which the present Defendants are named. D. 38. On June 14, 2010, Harvard moved to dismiss Dr. Shervin's state and federal discrimination and retaliation claims. D. 10; D. 11. On December 15, 2010, 2010 WL 5185384, the Court allowed Harvard's motion to dismiss in part, only as to Count 7, the c. 151C claim. D. 40. On June 30, 2010, Dr. Rubash moved to dismiss the tortious interference claim, D. 31, which the Court denied. D. 40.[5]

The parties have now engaged in extensive discovery, which has prompted numerous discovery disputes by and between the parties and various third parties. *See* D. 66; D. 71; D. 73; D. 91; D. 97; D. 99; D. 112; D. 114; D. 125; D. 127; D. D. 169; D. 182; D. 214. The Defendants moved for summary judgment on November 22, 2013. D. 144; D. 145; D. 148; D. 149. After extensive briefing and a hearing on

February 6, 2014, the Court took these matters under advisement. D. 254.

### IV. Standard of Review

#### A. *Summary Judgment*

The Court may grant summary judgment when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law based on the undisputed facts. Fed.R.Civ.P. 56(a). "An issue is genuine if the evidence of record permits a rational factfinder to resolve it in favor of either party." *Borges ex rel. S.M.B.W. v. Serrano–Isern,* 605 F.3d 1, 4 (1st Cir.2010) (citation and quotations omitted). "A fact is material if its existence or nonexistence has the potential to change the outcome of the suit." *Id.* at 5.

Once the moving party meets its burden of showing that there are no genuine issues of material fact, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," *Borges,* 605 F.3d at 5 (citation omitted), by presenting specific admissible facts. *Id.* "If the nonmovant fails to make this showing, then summary judgment is appropriate." *Id.*

"[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party "need only show that there is an absence of evidence in support of at least one element of [its] case in[ ] order to succeed on summary judgment." *Cellco*

---

5. The Court's order on the motions to dismiss also ruled that certain portions of the Defen-

dants' motions were mooted by the filing of the amended complaint. D. 40.

*P'ship v. Town of Grafton, Mass.,* 336 F.Supp.2d 71, 82 (D.Mass.2004). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in [her] favor." *Noonan v. Staples, Inc.,* 556 F.3d 20, 25 (1st Cir.2009). However, "conclusory allegations, improbable inferences, and unsupported speculation" are not sufficient to overcome summary judgment. *Sullivan v. City of Springfield,* 561 F.3d 7, 14 (1st Cir.2009) (citation omitted).

### B. *Statement of Material Facts*

The Defendants urge the Court to strike Dr. Shervin's statement of material facts, response to their statements of material facts and consolidated memorandum of law in opposition to their motions for summary judgment. D. 236. They contend that Dr. Shervin failed to comply with D. Mass. R. 56.1 and cite cases where courts have struck or otherwise rejected oppositions to summary judgment motions deemed non-compliant with this local rule for lack of conciseness and/or inclusion of immaterial statements of fact. D. 237 at 7–8.

A party opposing a motion for summary judgment "shall include a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." D. Mass. R. 56.1. The Court does not disagree that an excessive amount of ink has been expended on the pending summary judgment motions and opposition to same. Moreover, the Court does not disagree that many of the papers includes statements, arguments and suggestions that are not material to the issues of law that the Court must resolve in addressing the pending motions. It is, however, not only Dr. Shervin's papers that suffer from this problem. *See, e.g.,* Dr. Rubash's Memorandum in Support of

Summary Judgment, D. 144–1 at 3 n. 3 ("In one of the most curious aspects of this case Dr. Burke provided Dr. Shervin with approximately $375,000 from his personal account").

For this reason, and, significantly because of the Court's reluctance to initiate yet another round of briefing, the Court declines to grant the motion to strike and accordingly, D. 236 is DENIED. That having been said, the Court, however, has not relied upon any claims or facts that were not supported by specific references to the record or any alleged facts that were not material to deciding the Defendants' motions for summary judgment. *See Brown v. Armstrong,* 957 F.Supp. 1293, 1297 (D.Mass.1997); *Caban Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 7–8 (1st Cir.2007).

To the extent the Defendants argue that the Court should allow them an additional time to respond to Dr. Shervin's opposition papers, D. 237 at 9, the Court DENIES such request as moot as the Defendants have already filed responses, which the Court considered in deciding their motions for summary judgment. *See* D. 243; D. 246; D. 247; D. 253.

## V. Discussion

Dr. Shervin alleges gender discrimination in violation of Title VII against Partners, MGPO and Harvard, as well as gender discrimination in violation of c. 151B against all the Defendants. D. 38. Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's ... sex ..." 42 U.S.C. § 2000e–2(a)(1). Likewise, Mass. Gen. Laws c. 151B, § 4(1) makes it unlawful "[f]or an employer ... because of ... sex ... to ... discriminate against such indi-

vidual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." The statute also makes it unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter." Mass. Gen. Laws c. 151B, § 4(4A).

To prove gender discrimination under either statute, Dr. Shervin must show that "she is a member of a protected group who has been denied an employment opportunity for which she was otherwise qualified." *Dichner v. Liberty Travel*, 141 F.3d 24, 29–30 (1st Cir.1998). "Such a showing gives rise to an inference that the employer discriminated due to the plaintiff's [protected status] and places upon the employer the burden of articulating "a legitimate, nondiscriminatory reason for the adverse employment decision." " *Id.* at 30; *see also Tate v. Dep't of Mental Health*, 419 Mass. 356, 361, 645 N.E.2d 1159 (1995) (applying the same burden-shifting standards for c. 151B discrimination claim). This burden-shifting to the Defendants "entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the plaintiff's at all times." *Dichner*, 141 F.3d at 30. If the Defendants meet such burden, Dr. Shervin must then prove that the Defendants' explanation is a pretext for unlawful discrimination. *Id.*

Dr. Shervin further alleges retaliation in violation of Title VII against Partners and Harvard, as well as retaliation in violation of c. 151B, § 4(4) against all the Defendants. D. 38. Title VII provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3. Similarly, c. 151B, § 4(4) makes it unlawful "[f]or any person [or] employer ... to ... discriminate against any person because [s]he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five." To prove *prima facie* retaliation, Dr. Shervin must show that she "engaged in protected conduct," "suffered an adverse employment action" and that the "adverse action was causally connected to the protected activity." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir.2009) (citations and quotations omitted); *Mole v. University of Massachusetts*, 442 Mass. 582, 591–92, 814 N.E.2d 329 (2004). To show participation in a protected activity, Dr. Shervin need not prove that discrimination actually occurred, *id.* (citations and quotations omitted), but must show that she "reasonably and in good faith believed that the [defendant] was engaged in wrongful discrimination, that she acted reasonably in response to her belief, and that the [defendant's] desire to retaliate against her was a determinative factor in its decision to [engage in adverse action]." *Tate*, 419 Mass. at 364, 645 N.E.2d 1159.

██ Dr. Shervin also brings aiding and abetting claims against the Defendants, pursuant to Mass. Gen. L. c. 151B, § 4(5), which provides that it is unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." As to these claims, a defendant must

still have "the requisite intent to discriminate [or retaliate] in order to be liable for aiding and abetting." *Beaupre v. Cliff Smith & Associates,* 50 Mass.App.Ct. 480, 495 n. 23, 738 N.E.2d 753 (2000).

All the Defendants seek summary judgment on the claims for gender discrimination and retaliation under both Title VII and c. 151B on the basis that there is no genuine dispute of material fact that would foreclose the Court from granting summary judgment as to Dr. Shervin's timely claims. Specifically, Dr. Rubash, Dr. Herndon, Partners and MGPO argue that because of the Tolling Agreement, all of Dr. Shervin's discrimination and retaliation claims that occurred prior to June 5, 2008—300 days before April 1, 2009—are time-barred. D. 144–1 at 10; D. 152 at 9; D. 150 at 2. They further argue that there is insufficient timely evidence that they engaged in gender discrimination or retaliation, D. 144–1 at 16–19; D. 152 at 10; D. 150 at 8, and that Dr. Shervin has failed to present sufficient evidence of a tortious interference with a contract or advantageous business relationship. D. 144–1 at 19; D. 152 at 19; D. 150 at 18. Partners also argues that it qualifies for charitable immunity for the interference claim pursuant to Mass. Gen. L. c. 231, § 85K. D. 150 at 19.

Harvard asserts that it was not party to the Tolling Agreement, and that therefore, the statute of limitations date for claims against Harvard is December 30, 2008—300 days prior to the filing of Dr. Shervin's MCAD complaint on October 26, 2009. D. 151 at 28. Like the other Defendants, Harvard argues that neither the "continuing violation" doctrine nor the so-called grievance exception to the statute of limitations applies. D. 151 at 28. Harvard also seeks summary judgment on all counts on the grounds that even in considering Dr. Shervin's timely claims, Harvard

was not Dr. Shervin's employer, and therefore cannot be held liable under Title VII or c. 151B, and on the grounds that there is no evidence that Harvard possessed discriminatory animus, necessary for aiding and abetting discrimination or retaliation, since it is not the employer of Dr. Herndon or Dr. Rubash. D. 151 at 1–2.

The Court will address each of the Defendants' arguments.

### A. *The Grievance Exception Does Not Apply to Dr. Shervin's c. 151B Claims*

█ The Court first addresses Dr. Shervin's argument that regardless of the Tolling Agreement, the statute of limitations does not apply to her c. 151B claims because of the so called "grievance exception" to the statute of limitations. The Court concludes that the grievance exception does not apply because Dr. Shervin did not invoke any grievance proceedings pursuant to a collective bargaining agreement.

Under c. 151B (as well as Title VII), a claim of unlawful discrimination or retaliation must be filed with MCAD within 300 days of alleged illegal conduct. Mass. Gen. L. c. 151B, § 5; 42 U.S.C. § 2000e–5(1); *Ryan v. Holie Donut, Inc.,* 82 Mass. App.Ct. 633, 641, 977 N.E.2d 64 (2012). Massachusetts regulations provide, however:

> [The] 300 day requirement shall not be a bar to filing in those instances where … an aggrieved person enters into grievance proceedings concerning the alleged discriminatory act(s) within 300 days of the conduct complained of and subsequently files a complaint within 300 days of the outcome of such proceeding(s).

804 C.M.R. § 1.10(2); *see also* D. 231 at 64.

As Dr. Shervin notes in her papers in opposition to summary judgment, D. 231 at 64, the Massachusetts Supreme Judicial Court has "consistently granted deference to MCAD's decisions and policies" when interpreting c. 151B. *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 534, 750 N.E.2d 928 (2001). While the Court notes that 804 C.M.R. § 1.10(2) makes no explicit reference to collective bargaining agreements and only references "grievance proceedings," the MCAD has stated that it "has interpreted [the grievance] exception to apply only to formal grievance proceedings set forth in a collective bargaining agreement." *Hall v. Fidelity Investments, Inc.*, No. 06–BEM–02514 (MCAD Aug. 24, 2007). Deferring to MCAD's own interpretation of this regulation, the court in *Hall v. FMR Corp.*, 559 F.Supp.2d 120, 125–26 (D.Mass.2008), adopted the MCAD's position, holding that the plaintiff in that case could not benefit from the grievance exception because she did "not allege that she was covered by a collective bargaining agreement or that she pursued a formal grievance under the terms of such an agreement."

While Dr. Shervin directs the Court to cases concerning the application of 804 C.M.R. § 1.10(2), none of them stand for the broad proposition that 804 C.M.R. § 1.10(2) applies to nonunion-bargained grievance proceedings or that the MCAD has taken the position that it does. *See Silvestris v. Tantasqua Reg'l Sch. Dist.*, 446 Mass. 756, 847 N.E.2d 328 (2006);

*Martins v. Univ. of Mass. Med. Sch.*, 75 Mass.App.Ct. 623, 915 N.E.2d 1096 (2009); *Leitao v. State Street Corp.*, 74 Mass.App. Ct. 1101, 2009 WL 804162 (2009). In first two cases where the grievance exception was analyzed, the plaintiff was either party to a collective bargaining agreement or a union agreement was otherwise at-play. *See Silvestris*, 446 Mass. at 764, 847 N.E.2d 328 (grievance procedure set forth in plaintiff's collective bargaining agreement); *Martins*, 75 Mass.App.Ct. at 628, 915 N.E.2d 1096 (referencing the UMMS's grievance procedure) Pl.'s Br., *Martins v. Univ. of Mass. Med. Sch.*, No. 08–P–1343, 2008 WL 5009146, at *3 (Mass.App.Ct. Oct. 17, 2008) (noting that while plaintiff "did not belong to Union, [he] was transferred with the terms and conditions of the Union employees").[6] Dr. Shervin has not cited other decisions in which a plaintiff who was not party to a collective bargaining agreement was permitted to use the grievance exception to the statute of limitations. That this exception is confined to grievance proceedings arising out of collective bargaining process, a process that "promo[tes] stability in collective bargaining relationships without impairing the free choice of employees," *N.L.R.B. v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 794, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990) (citation omitted), is consistent with the MCAD's position regarding application of the regulation (as noted above in Hall) and as reflected in other MCAD rulings. *See, e.g., Randall v. Whittier Reg'l Voca-*

---

**6.** Addressing the cases cited in Dr. Shervin's surreply, the Court first notes that in *Leitao*, the court found that the plaintiff had not even entered into any grievance proceedings. 74 Mass.App.Ct., at *3. Dr. Shervin also relies upon *Tunnell v. Smith College*, No. 85–SEM– 0081, 8 MDLR 1189 (MCAD 1986). *See* D. 263–1 at 14. *Tunnell*, however, does not save Dr. Shervin's argument where it turned on whether the complaint before the grievance committee needed to allege sex discrimina-

tion or only the same underlying facts to invoke the grievance exception. *Id.* at 5. The decision does not address, however, whether the proceeding was in the collective bargaining context. Moreover, to the extent that Dr. Shervin relies upon the case to suggest MCAD's position about the scope of the grievance exception, certainly the same is superseded by MCAD's later pronouncement about the collective bargaining requirement in Hall in 2007.

*tional Technical High Sch.,* No. 97–BEM–0497, 2002 WL 31318576, at *5, *9 (MCAD Aug. 28, 2002) (reflecting collective bargaining agreement in place and relying upon 804 C.M.R. § 1.10(2)).

For these reasons, the Court finds that the grievance exception articulated in 804 C.M.R. § 1.10(2) does not apply here, and therefore, the statute of limitations did not toll during the pendency of Dr. Shervin's grievance proceedings.

### B. The Continuing Violations Doctrine Does Not Save Dr. Shervin's Time–Barred Claims

#### 1. Continuing Violation Doctrine Under Title VII

Dr. Shervin also argues that another exception to the statute of limitations, the "continuing violation" doctrine, allows her to base the Defendants' liability for discrimination and retaliation on conduct that occurred outside the limitations period.

Under both Title VII and c. 151B, plaintiffs may rely on conduct that occurred when the conduct amounts to a "continuing violation." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); 804 C.M.R. § 1.10(2). The United States Supreme Court clarified the reach of the Title VII continuing violation doctrine in *Morgan,* where the court held that while the continuing violation doctrine may provide an exception to the statute of limitations for claims which by "[t]heir very nature involve[ ] repeated conduct," *id.* at 114, 122 S.Ct. 2061, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113, 122 S.Ct. 2061. "Discrete acts" include such acts as "termination, failure to promote, denial of

transfer, or refusal to hire," *id.* at 114, 122 S.Ct. 2061, and, accordingly, a plaintiff "can only file a charge to cover discrete acts that 'occurred' [i.e., the day that the discrete discriminatory or retaliatory act 'happened'] within the appropriate time period." *Id.* The *Morgan* court, in differentiating "hostile environment claims" from such discrete acts, held that a defendant may be liable for discriminatory or retaliatory conduct that falls outside of the limitations period when "all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122, 122 S.Ct. 2061.

#### i. "Anchoring Events" that Fall Within the Limitations Period

Dr. Shervin argues that four timely events "anchor" her claims (i.e., fall within the requisite time period), and, therefore, all of the allegedly discriminatory and retaliatory conduct, including conduct occurring before June 5, 2008, is actionable. D. 231 at 67. Although the nature and circumstances of these events are disputed by the Defendants, Dr. Shervin contends that there is specific, admissible evidence from which a reasonable jury could find that these events were discriminatory and/or retaliatory. D. 231 at 67–68. These events, occurring between June 5, 2008 and October 26, 2009, include:

(1) Dr. Shervin asserts that Dr. Herndon aided and abetted the June 20, 2008 thesis presentation "walkout" by taking no action in response to residents walking out of the room during her thesis presentation. D. 231 at 67; D. 217 ¶¶ 354–355. While Dr. Shervin has not presented specific, admissible evidence that Dr. Herndon had prior knowledge that the walkout would occur,[7] Dr. Hern-

---

don testified at his deposition that although he was present when the residents walked out during Dr. Shervin's presentation, he did not respond to Dr. Shervin's concern or investigate the incident. D. 157–4 at 41–42.